**PRINCETON GRAPHICS OPERATING, L.P., Plaintiff,**

v.

**NEC HOME ELECTRONICS (U.S.A.), INC., Defendant.**

No. 87 Civ. 7257 (CES).

United States District Court, S.D. New York.

Feb. 22, 1990.

Amster, Rothstein & Ebenstein by Daniel Ebenstein, New York City, for plaintiff.

Milgrim Thomajan & Lee by Steven H. Hartman, New York City, for defendant.

MEMORANDUM DECISION

STEWART, District Judge:

Plaintiff Princeton Graphics Operating, L.P. ("Princeton") brought this action against defendant NEC Home Electronics (U.S.A.), Inc. ("NECHE"), alleging false advertising claims in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[1] By Stipulated Order dated May 24, 1988, the action was bifurcated between liability and relief for both discovery and trial purposes.[2] A non-jury trial was held as to liability between August 15, 1989 and August 30, 1989. After considering the evidence, we find for the plaintiff. The following constitutes our findings of fact and conclusions of law as mandated by Rule 52 of the Federal Rules of Civil Procedure.

*Factual Findings*

Plaintiff and defendant are competitors in the color video computer monitor field. The background to the instant action is the introduction of the PS/2 computer in the spring of 1987 and defendant's advertising claims with respect to PS/2 compatibility of its product, the MultiSync monitor (the "MultiSync").

In late 1986, rumors began circulating in the trade that the International Business Machines Corporation ("IBM"), the pacesetter and leader in the personal computer for business use arena, would introduce a new personal computer line, the PS/2. It was also rumored that the PS/2 would utilize a new "video standard," later known as "VGA" (for "Video Graphics Array"), that would utilize a 70Hz. "vertical frequency" which was higher than any then existing video standard.[3] Any new video standard

1. Although not addressed in its pre-trial or post-trial briefing, plaintiff also brought two pendent state claims pursuant to New York General Business Law ("GBL") § 368–d and GBL § 350–d. GBL § 368–d provides for injunctive relief where there is a likelihood of injury to business reputation. Upon assurances by defendant that the MultiSync was no longer being advertised or manufactured, plaintiff withdrew its motion for a preliminary injunction enjoining defendant from advertising the MultiSync as PS/2 compatible by letter dated November 4, 1987. In view of the fact that the injunctive relief prayed for in the complaint is not required, and that plaintiff by letter of February 2, 1990 waives the GBL § 368–d, we dismiss the GBL § 368–d claim. We discuss the GBL § 350 claim *infra*.

2. In a March 13, 1989 Memorandum Decision we denied, *inter alia*, defendant's motion for summary judgment on the basis that material issues of fact existed as to:

   1. whether the audience of the defendant's advertising was directed toward the relatively narrow "retail channel" of customers (i.e. computer distributors, retailers, and other relatively knowledgeable and sophisticated customers);

   2. whether there was a well established meaning of the term "compatible" within the "retail channel" such that defendant's utilization of that term was susceptible to a finding of literal falsity; and,

   3. assuming plaintiff succeeded in showing at trial that defendant's advertising was directed at the "retail channel" and that the "retail channel" uniformly assigned a particular definition to the term "compatible," whether the MultiSync's performance fell outside the definition so as to render defendant's advertising claims liter-

ally false. *Princeton Graphics Operating, L.P. v. NEC Home Electronics (U.S.A.), Inc.*, No. 87 Civ. 7257, slip op. at 16 (S.D.N.Y. Mar. 13, 1989).

3. Previously, the IBM video standards were "CGA" (Color Graphics Array"), "EGA" (Enhanced Graphics Array"), and "PGA/PGC" ("Professional Graphics Array"). These standards allowed for different capabilities in clarity of resolution as well as different abilities to display colors. As best this court can understand, the resolution abilities of the various video standards were marked by differences in the rate at which the entire monitor screen was redrawn one time (the "vertical frequency" or "vertical synchronization rate") and the number of scan lines from top to bottom on the video screen. CGA utilized a resolution of 640 pixels (the number of independent locations along a scan line) by 200 available scan lines, redrawn (or "refreshed") at a vertical synchronization rate of 60 times a second (or 60Hz.). EGA utilized a resolution of $640 \times 350$ lines at a vertical frequency of 60Hz. PGA displayed images in a resolution of $640 \times 400$ or $640 \times 480$ at a vertical frequency of 60Hz.

   The "horizontal frequency rate" of the various standards was determined by the number of times the monitor generated a sweep from left to right (the vertical synchronization rate multiplied by the number of scan lines). The CGA "horizontal frequency rate" was 15.75KHz. or 15,750 lines per second (the difference between the "horizontal frequency rate" and the actual product of the vertical frequency rate and number of scan lines was 62 available but undisplayed scan lines). The EGA "horizontal frequency rate" was 21.85KHz. The PGA "horizontal frequency rate" was 30.5KHz.

introduced by IBM would have an obvious effect on computer monitor manufacturers since to obtain images in a particular IBM video standard one needed a monitor capable of displaying such images in that standard.[4] Therefore, we find that in the spring of 1987, a monitor's PS/2 compatibility was a major market issue in the computer trade. *See* Trial Transcript at 605–06; Trial Transcript at 937.

In early April of 1987, IBM introduced its new PS/2 computer. The PS/2 generated video signals in three VGA modes: a 400 line mode with a vertical frequency of 70Hz. and a horizontal frequency of 31.5 KHz which was used to display text; a 480 line mode used to display graphics with a vertical frequency of 31.5 KHz. and a vertical frequency of 60Hz.; and a 350 line mode with a horizontal frequency of 31.5 KHz. and a vertical frequency of 70Hz.

Defendant shortly thereafter obtained a few PS/2 computers for testing with its monitor, the MultiSync. It found that a 9–pin to 15–pin adapter cable was necessary to allow the MultiSync to connect with the PS/2. It is undisputed by the parties and we so find that although when connected by the adapter cable the MultiSync displayed images generated by the PS/2, manual adjustments were required under certain conditions. When the program switched between the 60Hz. and 70Hz. modes the picture displayed would vertically roll. This required the user to utilize the

vertical hold knob on the monitor to stabilize the image each time the modes switched or locate a setting on the vertical hold knob which would simultaneously accommodate both modes. The second manual adjustment required that the user manipulate the MultiSync's vertical sizing control to compensate for a distorted image which could result if there was switching between the various VGA modes.[5]

It is also undisputed, and we so find, that NECHE in mid–April 1987 issued a press release and other correspondence claiming that after "extensive testing" the MultiSync had been determined to be "fully compatible" with the PS/2 with the addition of an adapter cable. In July of 1987 NECHE placed a full page ad in the *Wall Street Journal* which asserted that the MultiSync was "compatible" with the PS/2 when used with the cable adapter. We find and it is undisputed by the parties that this advertising was aimed at relatively sophisticated and knowledgeable consumers such as distributors, wholesalers, retailers, retail chains, and corporate purchasing personnel (the "retail channel"). *See, e.g.,* Defendant's Pretrial Memorandum at 12; Post Trial Memorandum of Plaintiff Princeton Graphics Operating, L.P. ("Pltf's Brief") at 3. These advertising claims were made despite the possibility that the above-discussed manual adjustments to the MultiSync might be necessary when it was connected by the adapter cable to the PS/2.[6] It is these claims which form the basis for

---

**4.** IBM created an "open architecture" for the IBM–PC computers. In essence, "open architecture" meant that IBM did not endeavor to keep secret its codes, programs, or internal workings of its computers. According to plaintiff, IBM published these specifications so that third-party vendors would be encouraged to make products and/or software that would be compatible with the IBM–PC computer. Trial Transcript at 17. This contention is undisputed by defendant.

**5.** As best this court can understand, according to plaintiff's expert, Bernard Lechner, this was the result of the MultiSync's inability to identify the "image identifier codes"—the polarities in the horizontal and vertical synchronizing pulses (the pulses that direct the monitor to come back from right to left and from the lower right to upper left). The MultiSync, according to Lech-

ner, ascertained any horizontal frequency above 27KHz. as a command to go to the PGA mode. Thus, since the horizontal frequency of VGA was 31.5KHz. the MultiSync interpreted a VGA signal as placing it in PGA mode. Further, because of the configuration of the pins in the adapter cable, the MultiSync would run in the 400 line PGA mode when in VGA. This apparently caused image distortion when the VGA mode changed from 400 lines to 480 or 350 lines. Trial Transcript at 83–84.

**6.** The necessity for manual adjustments to the MultiSync when connected to the PS/2 under certain conditions was confirmed in testing by an independent laboratory commissioned by the defendant in June of 1987. Plaintiff's Exhibit 18A.

the present action.[7]

At trial plaintiff argued that NECHE's claims of the MultiSync's compatibility with the PS/2 were false as the term was commonly understood within the "retail channel" and such claims were made by defendant intentionally and willfully. Further, plaintiff charged that NECHE's claim of the MultiSync's PS/2 compatibility was false because the MultiSync with the cable adapter exceeded Federal Communication Commission ("FCC") radiation requirements and thus was not legally qualified for sale in the U.S. market.

Defendant countered that plaintiff had failed to prove that its definition of compatibility was uniformly accepted within the "retail channel" and that the MultiSync was in fact compatible with the PS/2. In addition, defendant contended that plaintiff had no standing to bring the Lanham Act action, and that plaintiff had no valid FCC regulation claim since the MultiSync did not violate FCC regulations and even if it did, the violation would not create a Lanham Act claim.

Defendant argues that the term "compatible" in the computer trade had a broad meaning. It is defendant's view that "compatible" essentially is understood to mean "works with" or the ability of one device "to function with" another. To support its expansive definition, defendant introduced into evidence numerous articles and dictionary definitions as well as expert testimony.

Plaintiff argues that within the "retail channel," the term "compatible" was commonly understood to mean that when there is an established standard known throughout the industry, a computer product claimed to be "compatible" with it must perform at or beyond the standard's requirements. In support of its definition, plaintiff offered expert testimony.

We find that within the "retail channel," the term "compatible" does not have the broad and flexible meaning as suggested by defendant when, as here, there is a possibility that a more precise definition may be applied.[8] Indeed, if there was one over-arching impression left on this court after the testimony given in this case it was that the computer industry is concerned with and depends upon accuracy. Thus, the testimony confirms our view that in an industry which depends upon accuracy, a lack of precision in the use of common terms, particularly in circumstances where those terms have the potential to be specific, would be an anomaly.

Moreover, we find that even if the "retail channel" had the broad and flexible definition of "compatibility" as pressed by defendant, the MultiSync under certain conditions, although not in all, would be unable to "work with" the PS/2 making it incompatible with the PS/2 even under defendant's definition.

Plaintiff's witness Bernard Lechner, an electrical engineer and display systems consultant, testified that products were compatible when one product met the specific performance requirements of the standard set forth by the other product to which it was being compared—in this case whether the MultiSync met the performance requirements of the IBM VGA standard. Trial Transcript at 175. This narrow approach was echoed by plaintiff's other expert witness Paul Spindel, an engineer and computer consultant, who defined an IBM compatible monitor as one which when connected to an IBM computer "does everything that IBM intends a monitor to do." Trial Transcript at 375. We find both definitions consistent with each other since they are practical equivalents. Although defendant presented articles which it contended illustrated that the term "compatible" was a flexible one, this evidence was contradicted by defendant's own expert

---

7. Because of the relatively narrow audience to which the defendant's advertising was directed and their relative sophistication with regard to computer technology, we make no distinction between the terms "compatible" and "fully compatible."

8. We make no finding as to the understanding of the term "compatible" in the broader consumer market.

witnesses when asked about their definitions of "compatibility" as applied to products other than the MultiSync and PS/2.

Defendant's expert witness, Richard Atanus, the principal engineer responsible for the MultiSync, testified that while he considered the MultiSync compatible with the VGA standard, he also considered the MultiSync incompatible with another IBM standard, the Monochrome Display Adapter standard ("MDA"). It was Atanus' view that the MultiSync was incompatible with the MDA standard since on some MultiSync monitors the background was not "dark enough" to see text which might be "highlighted." Trial Transcript at 791. Thus, defendant's own expert witness testified that it was his belief that the MultiSync was incompatible with MDA merely because there was difficulty in distinguishing between highlighted and non-highlighted text. Atanus expressed this view notwithstanding the fact that the MultiSync's ability when connected by an adapter to display a serviceable image in MDA was consistent with defendant's broad definition of "compatible,"

Further, defendant's expert witness Steven Gibson, founder and president of his own software publishing company and author of a weekly column in a computer trade publication, testified that in relation to a software product of his company, his definition of "fully compatible" software was the ability of a software product to "*automatically* recognize ... different data encoding technologies and alter its behavior as required." Trial Transcript at 861 (emphasis added).

Thus, we find that although defendant's experts on the one hand testified that within the industry the definition of "compatible" meant merely the ability of one device to "work with" another device, their own definitions of "compatible" as applied to other situations and products belied that expansive definition. Indeed, their definitions were more closely akin to the narrow definition advanced by plaintiff's experts.[9] Moreover, it is significant that in a confidential memorandum written by Neil Strauss, at the time a product manager for defendant, to various employees and executives of defendant, Mr. Strauss articulated that one of the "key differences" between the new MultiSync II monitor, which did not require any manual adjustment when in VGA mode, and the MultiSync was that the MultiSync II offered "Full VGA compatibility."[10] Plaintiff's Exhibit 44.

We therefore find that in light of the evidence the definition of "compatible" as understood in the "retail channel" of sophisticated users has a clear and definite meaning—i.e., when a clearly defined standard, like IBM's VGA standard, exists and is widely accepted within the industry, a "compatible" product must meet that standard or at least perform in a manner equivalent to the standard's requirements.[11]

---

**9.** It is our view that "compatible" has the more expansive and relative definition advocated by defendant when there is no well-known standard in the industry. We note that a precise definition of "compatible" when there is a well-defined and accepted industry standard, and a broad definition of "compatible" in the absence of such a standard is neither inherently contradictory not impractical in a constantly changing industry. Rather, it is our view that such an approach would lend stability as new standards evolve and become accepted within the trade.

In this context we are persuaded by plaintiff that within the industry "VGA compatible" may be used to describe the performance of a monochrome gas plasma display of a lap-top computer (a "portable" computer with a built-in video display) even though there is a lack of autosizing and color by the lap-top when in VGA mode. The lap-top situation differs from one where, as here, the industry is well aware of the require-

ments of the standard to which other products are being compared, and where previous claims of a monitor's "compatibility" with standards such as CGA, EGA, and PGA meant that "compatible" monitors were able to meet all the technical requirements of those standards without any manual adjustment by the user. Therefore, claims as to the performance of a lap-top computer's built-in video monochrome display with the PS/2 has little persuasive weight with respect to assessing defendant's claims about the MultiSync.

**10.** Defendant introduced the MultiSync II in the fall of 1987. There is no dispute by the parties that the MultiSync II or plaintiff's UltraSync monitor, first available in the late summer of 1987, are PS/2 compatible.

**11.** We find that the dictionary and glossary definitions offered by defendant were of little pro-

We turn next to our findings in regard to the actual performance of the MultiSync with regard to the PS/2. Before the court plaintiff demonstrated the tendency of the MultiSync's picture to roll when the PS/2 computer switched from mode to mode.

Defendant countered that no screen rolling occurs when the user sets the vertical control knob to a position which will compensate for both modes. Given the evidence presented at trial we believe that most if not every MultiSync monitor had this capability. However, defendant did not produce any evidence at trial that users of the MultiSync, even sophisticated users, were advised by defendant that they had to locate an area on the vertical hold knob to stop the screen rolling, or even that such an area existed.[12] Indeed, testimony at trial indicated that even defendant's support staff were instructed as to the use of the vertical control knob to stop the rolling. Trial Transcript at 906. Therefore, we find that even assuming the vertical control knob on every MultiSync monitor had the capability of preventing screen rolling when the computer switched modes, there would have been some users who would have been forced to manually adjust the screen every time the modes switched be-

cause they were unaware of the full capabilities of the vertical control knob. Further, it was shown by plaintiff at trial that even if the vertical control knob were set to control the rolling, images became distorted when the computer switched modes, sometimes causing text to go off the screen.

In opposition, defendant demonstrated at trial that with certain software programs which switch modes when going from text to graphics the MultiSync was able to perform without major distortion or rolling observable by this court.[13] Moreover, defendant asserts that it has received no complaints about the MultiSync's performance with the PS/2.

It is our view that defendant's demonstration was probative of the fact that the MultiSync "works with" the PS/2 under certain conditions and with particular software programs. Indeed, defendant's demonstration illustrated the MultiSync's impressive capabilities.

However, defendant concedes that prior to the demonstration the MultiSync was manually adjusted to assure that the 480–line picture fit on the screen and that the vertical hold knob was set so as to prevent

bative value. Either the exhibit indicated only what the understanding might be within the general population and not the "retail channel," or the definition was worded in such a way to lend support to either party's position. The definitions set forth in the exhibits did little to indicate the common construction and understanding of the term within the "retail channel" when applied to concrete products.

Further, defendant offered articles published in trade magazines as evidence that "compatible" had a broad and flexible meaning within the "retail channel." However, the context of the use of "compatibility" varied in those articles. In certain articles "compatibility" was used in relation to "Super VGA" capability or in relation to a monochrome gas plasma video display's VGA capability. Thus, in those articles "compatibility" was being discussed in a different context than the instant situation. For example, testimony at trial indicated that "Super VGA" (800 × 600 resolution) is not an IBM standard. Trial Transcript at 970. Accordingly, defendant's articles are not of great persuasive weight since we believe that a broader understanding of compatible is favored by the "retail channel" in the absence of a clear industry standard.

Moreover, although the articles were not offered for the truth of their contents, we note only one short article offered by defendant explicitly stated that the MultiSync was "fully compatible" with VGA, and that explicit representation was only contained in a caption to the article's accompanying illustration. *See* Defendant's Exhibit 14.

**12.** Defendant contends that the MultiSync's user's manual instructs the user as to the operation of the vertical control knob and its relation to screen rolling. Defendant's Post-trial Reply Memorandum ("Deft's Reply") at 9. However, we find no instructions or advice as to the necessity to find and set the vertical control knob to eliminate screen rolling when the computer switches modes. Indeed, there is only a reference to screen "scrolling" in the user's manual which defendant in another part of its brief vigorously contended was not the same as "rolling." Deft's Reply at 8.

**13.** Defendant's expert, Mr. Gibson, demonstrated the MultiSync's operation with the PS/2 with the software program of Quattro.

rolling. Defendant's Post-trial Brief ("Deft's Brief") at 62. This concession greatly lessens the probative value of the demonstration since it was precisely the necessity to make manual adjustments to use the MultiSync with the PS/2 which was at issue. Thus, even if we were to conclude that the necessity to manually adjust the MultiSync by itself did not compromise defendant's claims of compatibility, we still find that the instructions to MultiSync users in the MultiSync's user's manual are inadequate to alert consumers as to how to use the manual controls to make the appropriate adjustments.

Accordingly, as noted earlier, we find it highly likely that some MultiSync users would be at the very least forced to manually adjust for screen rolling and/or manually adjust the size of the image every time their PS/2 switched modes in VGA. We believe this time-consuming and distracting problem would place the Multi-Sync's performance even beyond the defendant's broad definition of compatibility since it severely compromised the Multi-Sync's ability to "work with" the PS/2.

Further, we are not persuaded by defendant's assertion that it has received no customer complaints about the MultiSync's compatibility with the PS/2. At trial the evidence clearly showed that defendant stopped keeping records of inquiries, complaints, and requests over the phone from June 18, 1987 until February of 1988.[14] Trial Transcript at 898. The evidence at trial also indicated that the telephone records which were available prior to February 18, 1987 indicated inquiries about the MultiSync and compatibility but that the precise nature of the inquiry and the person receiving the call were unavailable.

Trial Transcript at 897. Given this record, defendant's claims regarding the lack of customer complaints are unpersuasive and unsupported.

### Conclusions of Law

■ As a threshold matter we must decide whether plaintiff has standing to bring this Lanham Act claim. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), confers standing upon "any person ... who believes that he is or is likely to be damaged" by the use of another party's false advertising claims. The statute is intended to be broadly construed.[15] See PPX Enterprises, Inc. v. Audiofidelity, Inc., 746 F.2d 120, 124 (2d Cir.1984). To establish standing a commercial party must show it has a "reasonable interest to be protected" against the allegedly false advertising claims. Id. at 125 (quoting Johnson & Johnson v. Carter–Wallace, Inc., 631 F.2d 186, 190 (2d Cir.1980)). To show a likelihood of injury, plaintiff must make a "logical causal connection between the alleged false advertising and its own sales position." Johnson & Johnson, 631 F.2d at 190.

Defendant asserts that plaintiff has no standing to bring this Lanham Act action since plaintiff in April of 1987 had no monitor that would work with the PS/2 and that plaintiff produced no evidence at trial that anyone was deterred from buying a Princeton monitor because of NECHE's allegedly false advertising claims of the MultiSync's compatibility with the PS/2.

It is undisputed that defendant and plaintiff were competitors in the computer monitor market during the relevant time of this action. Further, evidence produced at trial

---

**14.** According to defendant's former manager of technical support, Gary Livingston, about 98%–99% of inquiries, complaints, and requests to the technical support department regarding the MultiSync were made by telephone. Trial Transcript at 875.

**15.** Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as amended, states in relevant part: Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name symbol, or device, or any combination thereof, or any false desig-

nation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
\* \* \* \* \* \*
(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities ... of his or her or another person's goods, services, or commercial activities,
\* \* \* \* \* \*
shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

which showed that after the introduction of the PS/2 and before defendant's claim of MultiSync compatibility with the PS/2, both plaintiff's and defendant's sales of monitors dropped. Defendant's Exhibit 67; Plaintiff's Exhibit 187. After defendant's claim of MultiSync's compatibility with the PS/2, a claim that plaintiff could not and did not make in regard to its own monitors, MultiSync sales rose back to previous levels. However, testimony revealed that plaintiff's monitor sales, while slightly rising in June and July, continued to be depressed overall. Trial Transcript at 1009.

Plaintiff further contends that defendant's advertising of MultiSync's PS/2 compatibility in the spring of 1987 directly affected potential purchasers of plaintiff's own PS/2 compatible UltraSync monitor which would become available in the summer of 1987. It is our view that this showing provides a reasonable basis for plaintiff's belief that defendant's claims of compatibility had a logical causal connection to plaintiff's sales position. As the Second Circuit has stated:

> The statute demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising. The correct standard is whether it is *likely* that [defendant's] advertising has caused or will cause a loss of [plaintiff's] sales, not whether [plaintiff] has come forward with specific evidence that [defendant's] ads actually resulted in some definite loss of sales.

*Johnson & Johnson*, 631 F.2d at 190 (emphasis original).

We believe that plaintiff has a presented a reasonable basis for its belief it was likely that defendant's advertising caused it damage. First, it is logical to conclude that had consumers been faced with two monitor products in the spring and summer of 1987, neither of which claimed PS/2 compatibility, some might have chosen plaintiff's. It is also reasonable to assume that had there been no compatibility claim on the part of defendant in the spring of 1987, some consumers would have waited until the summer of 1987 to buy plaintiff's PS/2 compatible UltraSync. Accordingly, we conclude that plaintiff has standing to bring this action.[16]

■ The Second Circuit has described two alternative bases for recovery in Lanham Act false advertising actions. They are:

> When a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public. [citations omitted]. When the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction.

*Johnson & Johnson v. GAC International, Inc.*, 862 F.2d 975, 977 (2d Cir.1988) (quoting *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)); *see also PPX Enterprises v. Audio Fidelity Enterprises*, 818 F.2d 266, 272 (2d Cir.1987) (if statement is literally false, relief can be granted on court's own findings in cases involving claims for both injunctive relief or damages). Plaintiff brings its Lanham Act claim under the former basis. *See, e.g.*, Pltf's Brief at 1.

In our Memorandum Decision in which we denied, *inter alia*, defendant's motion for summary judgment, we stated that plaintiff had to establish: (1) that a common meaning of "compatible" existed within the trade; (2) what the common definition was; and (3) that in light to the common definition, defendant's claims of MultiSync compatibility with the IBM PS/2 com-

---

16. Defendant asserts that since many customers in the "retail channel" research and test a monitor's capabilities before buying, even if defendant's claims were false it is unlikely that many in the "retail channel" were misled. Deft's Brief at 73 n. 28. Since the action has been bifurcated between liability and relief, during this liability phase plaintiff was not required to show proof of actual loss and to what extent any within the "retail channel" were actually influenced by defendant's claims to purchase Multi-Sync monitors. Thus, our conclusion that plaintiff has standing to bring this Lanham Act action does not imply that this court has reached any conclusion as to damages.

puter were literally false. *Princeton Graphics Operating, L.P. v. NEC Home Electronics (U.S.A.) Inc.*, No. 87 Civ. 7257 (CES), slip op. at 17 (S.D.N.Y. March 13, 1989) (the "March 13th Decision"). According to the March 13th Decision literal falsity was to be determined in the context of the audience to whom the advertising was being conveyed. March 13th Decision at 14–16 (citing *Plough, Inc. v. Johnson & Johnson Baby Products Co.*, 532 F.Supp. 714, 717 (D.Del.1982) ("Context can often be important in discerning [whether] the message conveyed [is literally false] and this is particularly true where as here, the target of the advertising is not the consuming public but a more well informed and sophisticated audience....")).

Given our earlier findings of fact: (1) that the defendant's advertising proclaiming the MultiSync's compatibility with the PS/2 was directed at a specific target of sophisticated consumers in the trade (the "retail channel"); (2) that within that target group "compatibility" has a common and well-defined definition; and (3) that the performance of the MultiSync did not come within the parameters of that definition, we conclude that plaintiff has established that defendant's advertising claims were literally false.

Further, in view of our factual finding that these false claims were made at a time when a monitor's PS/2 compatibility was a major market issue, we also conclude that defendant's false claims were about a "material" characteristic of the MultiSync which would lead consumers to believe the MultiSync was competitively superior. *See Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 278 (2d Cir.1981) (misrepresentations made with regard to an "inherent characteristic" of product include those claims which falsely depict a product as being competitively superior). Accordingly, we conclude that defendant's claims of the MultiSync's compatibility with the PS/2

were in violation of section 43(a) of the Lanham Act.[17]

### GBL § 350–d

■ As a threshold matter, with regard to plaintiff's GBL § 350–d claim (renumbered in 1989 to GBL § 350–e) we must decide whether plaintiff, by not addressing this pendent claim in its pre-trial and post-trial briefing or at trial, has waived it. Plaintiff argues that this claim remains in the case because the standards for finding liability under GBL § 350 are substantially the same as under section 43(a) of the Lanham Act. February 2, 1990 Letter of Daniel Ebenstein at 2. Defendant argues that since the only claim briefed by the parties was the Lanham Act claim and because standing under GBL § 350 was not briefed by the parties, plaintiff failed to preserve the state claim. February 14, 1990 Letter of Stephen Hartman. Moreover, defendant asserts that plaintiff has no standing to bring a claim pursuant to GBL § 350.

We conclude that the claim pursuant to GBL § 350 survives despite plaintiff's failure to raise it at trial or address it in its briefing. It is our view that defendant suffered no prejudice by plaintiff's failure to brief this claim or address this claim at trial since the same operative facts establish a violation of both section 43(a) of the Lanham Act and GBL § 350. *See Grant Airmass*, 645 F.Supp. 1507, 1509 (S.D.N.Y. 1986); *cf. Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 588 F.Supp. 1082, 1083 n. 4 (S.D.N.Y.), *aff'd*, 747 F.2d 114 (2d Cir.1984). Indeed, any prejudice by plaintiff's failure to raise the state claim would inure to plaintiff since it has the burden of persuasion.

Moreover, it is our view that plaintiff's standing to bring this claim is determined in this instance as a matter of law. Accordingly, since defendant has addressed the standing issue as a matter of law in correspondence to the court, defendant has not been prejudiced by its inability to ad-

---

**17.** Having so decided we do not reach plaintiff's other argument that the MultiSync when connected to the PS/2 by its adapter cable exceeded Federal Communication Commission radiation requirements and therefore was not legally qualified for sale within the United States.

dress the section 350–d claim at trial.[18]  *Cf. McFadden v. Sanchez,* 710 F.2d 907, 911 (2d Cir.) (late modification of pre-trial order should not be allowed if seriously prejudicial to a party), *cert. denied,* 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983).

■ GBL § 350–d permits "any person" who has been injured by false advertising to bring an action, *inter alia,* to recover actual damages or fifty dollars, whichever is greater.  The Practice Commentaries to GBL §§ 349–50 state that:

> If the principal injury is to consumers and incidentally to a competitor, competitor standing serves the purposes of the statute.  If competitive injury is the principal issue, use of GBL §§ 349–350 may be misplaced because its purpose is to protect consumers, not competitors as such.

R. Givens, *Practice Commentaries on General Business Law §§ 349, 350* at 572 (McKinney 1988).

Indeed, some courts have asserted that only a consumer may bring an action under this section.  *See H.L. Hayden Co. of New York v. Siemens Medical Systems,* 672 F.Supp. 724, 749 (S.D.N.Y.), *aff'd on different grounds,* 879 F.2d 1005 (2d Cir.1989); *cf. Morris v. Gilbert,* 649 F.Supp. 1491, 1497 (E.D.N.Y.1986) (GBL § 349 inapplicable to sale of securities since legislature probably did not intend consumer protection laws to extend that far).  However, other courts have held that a competitor alleging false comparative advertising has standing to bring a claim pursuant to GBL §§ 349–350 as well as section 43(a) of the Lanham Act.  *See Construction Technology v. Lockformer Co., Inc.,* 704 F.Supp. 1212, 1222–23 (S.D.N.Y.1989) (false comparative advertising affects public at large); *Grant Airmass Corp. v. Gaymar Industries, Inc.,* 645 F.Supp. at 1509.

We agree with Judge Mukasey's reasoning in *Construction Technology, supra,* that while the purpose of the statute is to protect consumers, it does not disable a competitor from bringing an action pursu-

ant to the statute if the nature of the claim asserted directly affects the interests of consumers.  *Construction Technology,* 704 F.Supp. at 1222; *cf. Azby Brokerage, Inc. v. Allstate Insurance Co.,* 681 F.Supp. 1084, 1089 (S.D.N.Y.1988) (harm to public interest is within scope of GBL § 349).  It is our view that plaintiff's false advertising claims directly affect the interests of consumers and thus serves the purpose of the statute.  As such, we hold plaintiff has standing to pursue its GBL § 350–d claim.  Moreover, because the standards for a violation under section 350–d are substantially the same as under section 43(a), we find for plaintiff on the state claim as well.

<div align="center">Conclusion</div>

For the above reasons, we find that defendant NEC Home Electronics (U.S.A.), Inc. violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and section 350–d (now section 350–e) of the New York General Business Law.  In this liability phase of the action we hold for plaintiff.

SO ORDERED.

</div>

---

**18.** We also note that defendant made no motion at trial to dismiss the state claims pursuant to

Fed.R.Civ.P. 41(b).